1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable RONALD B. LEIGHTON

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

FAMILY PAC,

                        Plaintiff,

    v.

ROB MCKENNA, in his official capacity
as Attorney General of Washington, and
JIM CLEMENTS, DAVE SEABROOK,
JANE NOLAND, JENNIFER JOLY and
BARRY SEHLIN, members of the Public
Disclosure Commission, in their official
capacities,

                        Defendants.

NO. C09-5662 RBL

DECLARATION OF
DOUG ELLIS

I, Doug Ellis, declare as follows:

      1.      I am over the age of 18 and competent to testify on the matters contained in this Declaration.

      2.      I am the Interim Executive Director of the Washington State Public Disclosure Commission (Commission).  I was appointed to this position effective April 1, 2010.  Prior to that I was the Assistant Director.  I became the Assistant Director in 2005.  Prior to that time, I was the agency Director of Public Outreach.  I have been employed by the Commission since 1992.

      3.      My duties include overseeing the day-to-day operations of the PDC, as well as performing  Assistant  Director  duties  during  the  interim  appointment  period.   My  duties

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

1

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

therefore also include direct supervision of the Compliance, Administrative and Customer Service/Public Outreach Divisions of the PDC, as well as oversight of the Information Technology Division's Chief Technology Officer.  I supervise all PDC enforcement cases.  I am the agency's legislative liaison.

4.     I am aware that the Plaintiff, Family PAC, is challenging the constitutionality of a disclosure statute and a rule at RCW 42.17.090(1)(b) and WAC 390-16-034, and another provision of state law regarding timing and disclosure at RCW 42.17.105(8).  This declaration supplements information previously provided to the Court as part of the state's response to Family PAC's motion for a temporary restraining order and preliminary injunction.  The purpose of my testimony in this declaration is to:

a.  Discuss the PDC (¶¶5-10);

b.  Describe the Washington State culture of disclosure and compliance with disclosure requirements by campaigns, and how persons filing with the PDC can and do receive guidance and assistance from the Commission and its staff (¶¶11-17, 27-31);

c.  Describe the information that the PDC gathers from filers and makes available to the public, and how that information is made available and used (¶¶18-26);

d.  Summarize Washington's disclosure requirements and process (¶¶32-34);

e.  Describe RCW 42.17.090(1)(b) (which requires reporting of names and addresses of contributors contributing more than $25) and describe the PDC's C3 form filers use to report that information (¶¶35-49);

f.  Describe WAC 390-16-034 (which requires reporting of contributors' occupations and employers when contributing more than $100) and the fact that information is also provided on the C3 form (¶¶50-56);

g.  Describe the 21-day timing and disclosure provision in RCW 42.17.105(8) (¶¶57-65);

h.  Describe that Family PAC has not contacted the Commission to seek a modification of reporting requirements, an advisory opinion, Interpretive Statement, amendments to or repeal of rules, or a declaratory order; and describe that Family PAC has reported to the PDC no campaign finance activity regarding

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

2

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1
2

contributions or expenditures in Washington State, and describe other information about Family PAC (¶¶66-68); and

3

i.  Describe Washington State's other pending litigation in lawsuits filed by Family PAC's legal counsel here, also challenging provisions of RCW 42.17 (¶69).

4

**Washington State Public Disclosure Commission**

5
6
7
8
9
10
11
12
13
14
15
16
17

5.     The PDC was created through the passage of Initiative 276 in 1972 (effective in 1973), which passed overwhelmingly by a vote of 72 percent.  I understand a copy of a Declaration by Jolene Unsoeld filed in *Human Life of Washington v. Brumsickle* (U.S. District Court Case No. 08-0590) also filed in this court provided the early history of Initiative 276. Initiative 276 was codified in Chapter 42.17 RCW (RCW 42.17).  That is the chapter of law the PDC implements and enforces.  RCW 42.17 addresses a number of areas concerning disclosure of campaign and other information to the public.  Those include campaign financing, lobbyist reporting, reporting of public officials' personal financial affairs, and reporting by public treasurers.  At one time, RCW 42.17 also contained the open public records provisions for all public agencies which originated in Initiative 276, although the PDC did not enforce those sections because those sections had an enforcement mechanism through the superior courts.  The public records provisions have now been recodified in Chapter 42.56 RCW.

18
19
20
21
22
23
24

6.     The policy statement in RCW 42.17.010 includes the following language:  "It is hereby declared by the sovereign people to be the public policy of the state of Washington: (1) That political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided."  The policy statement also explains, "(10) That the public's right to know of the financing of political campaigns and lobbying and the financial affairs of elected officials and candidates far outweighs any right that these matters remain secret and private."

25
26

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

3

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

7.      A second citizen initiative in 1992, Initiative 134, added several campaign finance provisions to RCW 42.17, such as creating contribution limits for state office elections.

8.      The Commission has adopted rules to implement RCW 42.17.  Those rules are located in Title 390 Washington Administrative Code (WAC).

9.      The agency is led by a five-member bipartisan citizen's commission that is appointed by the Washington State Governor and confirmed by the Washington State Senate. By statute, commissioners serve staggered terms of five years of no more than one full term each, and no more than three members can be affiliated with the same political party. Commissioners are prohibited by law from being politically active while they serve on the Commission.  Historically, commissioners' backgrounds include serving as a former legislator or local government official, or having had the experience of running or assisting a campaign, or having a legal background, or other experience with campaign or lobbying laws.   The Commission members are not full-time employees; the Commission meets approximately one day a month to set policy, adopt rules, hear enforcement cases, make recommendations for legislative changes, and other similar activities.  The current commissioners are Jim Clements (who serves as chair), David Seabrook, Jane Noland, Barry Sehlin and Jennifer Joly.

10.      As noted, I oversee the day-to-day operations of the agency.   The agency currently has 22 employees and is located in Olympia, Washington.  I manage staff, oversee the budget and physical facilities, implement Commission decisions with respect to RCW 42.17, schedule and prepare for Commission meetings and hearings, and similar activities.  Staff members include those who work with communications to the public, provide assistance to filers, create and manage the PDC website and database, develop electronic filing systems, investigate complaints regarding alleged violations of the law, and others.   The agency's $2.3 million current annual budget is dedicated approximately as follows:  66 percent of PDC resources are devoted to providing information to the public (including providing assistance to candidates, political committees, and others who must comply with RCW 42.17

and its implementing regulations); 24 percent to enforcement of the PDC laws and rules; and, 10 percent to administration.

**Access to Information Provided by the PDC, Including Online**

11.     Providing information to the public is a core mission of the PDC, particularly as it enables the public to "follow the money" with respect to campaigns and lobbying. In essence, providing such information to the public is the PDC's reason for being.  The types of reports filed with the PDC include:

- Campaign finance reports, including political committee registration forms, contribution reports, expenditure reports, independent expenditure reports, and others disclosing the financing of Washington State campaigns;

- Lobbying reports disclosing expenditures by lobbyists and for lobbying efforts; and,

- Personal financial affairs reports disclosing the economic interests of candidates, elected officials, and many appointed state officials.

12.     All reports filed with the PDC disclosing campaign, lobbying and other activities under the laws and rules are public records.  Before the mid-1990s, all reports were filed on paper.  Members of the public, and especially the media, would ask the PDC to provide them copies of the paper reports.  Today, thousands of campaign finance and lobbying reports are filed electronically and made available on the PDC's website at www.pdc.wa.gov. In addition, paper reports filed by campaigns are scanned and typically made available on the website within four hours of receipt by PDC staff, and within 15 minutes for electronically filed reports.  Information is then extracted from these electronically filed reports and scanned paper reports and provided to the public free-of-charge on the website in a searchable database.

13.     As a result, information from filed campaign finance reports is quickly available online to the voters and to the public, in a searchable format.  The public can then use these reports to "follow the money" in campaigns, and also conduct their own analysis.  Given the majority of voters in Washington State also now vote by mail, the voters can have access to

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

5

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

this campaign finance information at their homes 24/7, and while they are filling out their ballots.

14.     As reflected in the PDC's 2009 *Annual Report*, during fiscal year (FY) 2009 (July 1, 2008 – June 30, 2009), the PDC received, through paper filings or electronically, 97,946 reports (totaling 386,981 pages) from candidates, elected and appointed officials, lobbyists, lobbyist employers, political committees and other filing reports (such as those making independent expenditures).  The *Annual Report* also shows that during FY 2009, the PDC website received 40,423 unique visitors, and 596,223 web pages were viewed.  I understand PDC Chief Technology Officer Michael Smith will be providing more details on PDC website access by the public.

15.     The PDC is considered by many observers to be the best in the nation for its disclosure mechanisms that enable the public to access lobbying and campaign finance information.  This is due in large part to the efforts devoted to the website and the database as well as the statutory requirements.  The PDC has been ranked by several organizations as having one of the best, if not the best, disclosure programs in the country.  Those include the following organizations:

a.  The *Campaign Disclosure Project*, which describes itself as a project of the UCLA School of Law, the Center for Governmental Studies, and the California Voter Foundation, supported by The Pew Charitable Trusts.  The Campaign Disclosure Project evaluates, grades, and ranks all 50 states' performance in four campaign finance disclosure areas: the strength of campaign disclosure laws; availability of electronic filing programs; the degree of public access to campaign finance information; and the usability of state disclosure web sites.  In its annual report "Grading State Disclosure" it has ranked Washington as number one in the country in each year from 2003 – 2007 for campaign disclosures (Grade A, number one ranking; reports available at http://www.campaigndisclosure.org/).

b.  The *Center for Public Integrity*, which describes itself as a non-partisan, non-advocacy organization dedicated to producing original, responsible investigative journalism on issues of public concern.  It ranked Washington as number one in 2006 for campaign disclosure of financial disclosure laws applying to legislators and number one in 2007 for disclosure of financial affairs of governors.  In 2009,

as in previous years, it gave Washington a grade "A." (Rankings available at http://www.publicintegrity.org/OI/db.aspx?act=rank and http://www.publicintegrity.org/StateDisclosure/Default.aspx?act=executive and http://www.publicintegrity.org/investigations/states_of_disclosure/rankings/).

    c.   The *Ballot Initiative Strategy Center Foundation*, which describes itself as tracking ballot measure developments, contributions to ballot measure campaigns and training people to work on ballot initiatives. In its 2002 report "The Campaign Finance Reform Blind Spot" it ranked Washington number one in disclosure, stating on page 25 that "Washington has the single best disclosure program of any state in the country."
(Report at http://ballot.org/vertical/Sites/%7B26C6ABED-7A22-4B17-A84A-CB72F7D15E3F%7D/uploads/%7BA8911D38-14D3-438F-AE43-B78BBADBE500%7D.PDF).

    d.   The *National Institute on Money in State Politics*, which describes itself as the only nonpartisan, nonprofit organization revealing the influence of campaign money on state-level elections and public policy in all 50 states. Its website is FollowTheMoney.org. It states it encourages transparency and promotes independent investigation of state-level campaign contributions by journalists, academic researchers, public-interest groups, government agencies, policymakers, students and the public at large. It uses reports filed with agencies such as the PDC to conduct its own analysis of campaigns, by state. In its August 1, 2007 press release regarding its report titled "Indecent Disclosure: Public Access to Independent Expenditure Information at the State Level" it described Washington as one of only four states that disclose information on independent expenditures in a way the public can understand, and also referencing ballot measure disclosures of independent expenditures (press release available at http://www.followthemoney.org/Newsroom/index.phtml?r=332; report available at http://www.followthemoney.org/press/Reports/200708011.pdf).

    16.    I believe, and the Commission believes, that the public expects a user-friendly method of accessing campaign information online. It has become part of the political culture of this state. As noted, this expectation is also a result of the combination of the state's disclosure laws and advances in technology, both of which enable quick and accurate public access to campaign finance data. For example, the directives for agencies to make information available to the public electronically came from the State Legislature in 1994 and specific to the PDC in 1999. RCW 42.17.367 provides:

    By February 1, 2000, the commission [PDC] shall operate a web site or contract for the operation of a web site that allows access to reports, copies of reports, or

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

7

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1
2
3
4
5

> copies of data and information submitted in reports, filed with the commission under RCW 42.17.040, 42.17.065, 42.17.080, 42.17.100, and 42.17.105. By January 1, 2001, the web site shall allow access to reports, copies of reports, or copies of data and information submitted in reports, filed with the commission under RCW 42.17.150, 42.17.170, 42.17.175, and 42.17.180. In addition, the commission shall attempt to make available via the web site other public records submitted to or generated by the commission that are required by this chapter to be available for public use or inspection.

6      The legislative finding from 1994 in the Code Reviser Notes after the codification of that

7      statute in the Revised Code of Washington cites to Laws of Washington 1994, Chapter 40,

8      Section 2, and states:

9
10
11
12
13

> The legislature finds that government information is a strategic resource and needs to be managed as such and that broad public access to nonrestricted public information and records must be guaranteed. The legislature further finds that reengineering government processes along with capitalizing on advancements made in digital technology can build greater efficiencies in government service delivery. The legislature further finds that providing citizen electronic access to presently available public documents will allow increased citizen involvement in state policies and empower citizens to participate in state policy decision making.

14     17.    In 1999, the legislature directed that filing of reports with the PDC be made

15     available through an electronic means, beginning in July 1999.   RCW 42.17.369;

16     RCW 42.17.3691.   The legislature also provided that the PDC shall make available an

17     electronic copy of the reporting forms at no charge.   RCW 42.17.369(3).   The legislature

18     established statutory performance measures providing that the PDC is to describe how quickly

19     reports are made available to the public online, such as the average number of days that elapse

20     between the time a report is filed and when it is available online, and a description of who is

21     filing reports electronically.   RCW 42.17.463.   The legislature required the Commission to

22     develop an information technology plan and performance reports.   RCW 42.17.465 - .469.

23     **How PDC Information Is Used**

24     18.    I believe, as do others in my field, that access to campaign finance information

25     is a critical component of fostering an informed electorate.   Disclosure of such information,

26     particularly when it is accurate and timely, adds more speech into the public political discourse

1   at a time when voters need it.  As described, in today's online culture, quick and easy access to

2   accurate and current information via the Internet on candidate and ballot measure contributions

3   and expenditures is now an established expectation among voters, the media, campaigns,

4   researchers, and others.  The PDC website and database are heavily used by the public to

5   access campaign finance, lobbying, and other related information.

6        19.     The media are also frequent users of such PDC information to help inform the

7   public.  In my current position with the PDC, as well as in my prior positions, I frequently

8   respond to calls from media representatives who had reviewed information in the PDC

9   database or on the website and want to follow up because they are writing a story about a

10  particular campaign or other campaign-related stories.  Attached at Exhibit A is an example of

11  a media story about campaigns (*Bellingham Herald* article from March 20, 2010 titled "Who's

12  Funding the Candidates?  It's Easy to Find Out" was published during "Sunshine Week" which

13  is an effort to promote and discuss open government.).  I understand more examples of media

14  contacts are being provided in the declarations of PDC Communications and Training Officer

15  Lori Anderson and Chief Technology Officer Michael Smith.  Other examples are attached to

16  Declaration of Scott F. Bieniek in Support of Plaintiff's Motion for Summary Judgment

17  (Bieniek Declaration) at Exhibit 1, page 11 (inquiry from *Seattle Times*); Exhibit 4, page 7

18  (inquiry from *The Oregonian*).

19       20.     Other users of the information filed with the PDC are candidates (who will also

20  review reports of their opponents, checking for disclosure and accuracy), and national

21  organizations such as those I described in paragraphs 15 and 53 that are compiling studies or

22  information on campaigns and campaign finance.

23       21.     Access to such online campaign finance information impacts the outcome of

24  elections.  A study released April 3, 2002 by the *Pew Internet and American Life Project* titled

25  "The Rise of the E-citizen:  How People Use Government Agencies' Websites" found that

26  even as far back as 2002, 14 million people at that time had used government websites to

1    gather information to help them decide how to cast their votes.  A copy of the study is

2    available at http://www.pewinternet.org/pdfs/PIP_Govt_Website_Rpt.pdf.

3           22.    In addition to gathering data and reports and making them available to the

4    public, the PDC staff also analyzes data and provides summary reports to show the public such

5    information as overall totals of contributions and expenditures, the participants, and trends.

6    The PDC publishes an *Election Financing Fact Book* (fact book) for each even-numbered year

7    concerning state elections.  This effort began with what is viewed as the first "fact books"

8    prepared by Jolene Unsoeld in the 1970s.  The information in the fact books is compiled from

9    campaign finance reports filed by candidates and political committees disclosing activity.  The

10   fact books are made available to the public, the media, legislators and others, on the PDC

11   website at http://www.pdc.wa.gov/home/historical/publications/Factbooks.aspx.

12          23.    In 2008, for overall contribution and expenditure totals for ballot measures, the

13   fact book describes 12 statewide ballot proposition committees reported to the PDC, for a total

14   of $9,565,276 in contributions and $9,547,845 in expenditures; and 89 local ballot measure

15   committees reported a total of $3,759,984 in contributions and $3,716,975 in expenditures.

16   Exhibit B.

17          24.    The 2008 fact book also summarized the expenditures supporting and opposing

18   all statewide initiatives from 1975 to 2008.  Exhibit C.  Expenditures for and against a single

19   initiative have reached as high as $15,679,653 (in 2005 regarding Initiative 330, which

20   concerned claims for negligent health care).

21          25.    The 2008 fact book also shows all contributions and expenditures for all

22   political committees reporting to the PDC in 2008, which totaled (just for 2008) as follows:

23   523 political committees received $75,135,499 in contributions and made $68,664,342 in

24   expenditures.

25

26

1    26.    In sum, the reports filed with the PDC enable the agency and the public to see

2    and analyze where and when millions of dollars are received and spent with respect to ballot

3    measures and candidates in a timely manner.

4    **Assistance to Filers – Requests for Advice or Guidance**

5    27.    The PDC provides a number of mechanisms to give assistance to persons who

6    file reports with the agency, and who have questions or other reasons to contact the agency.

7    As noted, the website provides much useful information, including links to the statutes and

8    rules, manuals and brochures for filers, Commission meeting schedules and materials for the

9    meetings including rulemaking activity, forms, training schedules, historical reports, and other

10   information.  Electronic filers are provided software – the PDC's campaign finance software

11   called ORCA (Online Reporting of Campaign Activity) – for free, and ORCA training is free.

12   Copies of the software and other candidate information are also made available to county

13   auditors, for distribution to filers.   If a filer wants to contact someone at the PDC, the

14   assistance can be formal or informal and is provided by PDC staff, or, depending upon the

15   question, by the Commission.  The PDC has a toll-free number.  Staff answers telephone and

16   e-mail questions from filers.  As noted in the most recent *Annual Report*, staff conducted 41

17   training opportunities for candidates, political committees, lobbyists and others; in total, there

18   were 1,147 attendees at these trainings.  Candidate training videos are available for streaming,

19   again for free.  Examples of responses to telephone, email and letter inquiries to PDC staff are

20   attached as exhibits to the Bieniek Declaration.

21   28.    If PDC staff is unable to answer a question or the answer is not readily available

22   on the website, and the person inquiring seeks direction from the Commission, there are a

23   number of options available.  Those include, for example, submitting an informal advisory

24   opinion request, a formal declaratory order request (WAC 390-12-250), a formal request for

25   guidance   through   issuance   of   an   interpretive   statement   (Interpretation)   under

26   RCW 34.05.230(1), or a formal rulemaking petition (RCW 34.05.330 and WAC 390-12-255).

1    In addition, the law also authorizes the Commission to respond on a case-by-case basis to

2    "modification requests" of filers.  Under RCW 42.17.370(10), the Commission is authorized

3    to:

> After hearing, by order approved and ratified by a majority of the membership of
> the commission, suspend or modify any of the reporting requirements of this
> chapter in a particular case if it finds that literal application of this chapter works
> a manifestly unreasonable hardship and if it also finds that the suspension or
> modification will not frustrate the purposes of the chapter. The commission shall
> find that a manifestly unreasonable hardship exists if reporting the name of an
> entity required to be reported under RCW 42.17.241(1)(g)(ii) would be likely to
> adversely affect the competitive position of any entity in which the person filing
> the report or any member of his or her immediate family holds any office,
> directorship, general partnership interest, or an ownership interest of ten percent
> or more. Any suspension or modification shall be only to the extent necessary to
> substantially relieve the hardship. The commission shall act to suspend or modify
> any reporting requirements only if it determines that facts exist that are clear and
> convincing proof of the findings required under this section.

**Culture of Disclosure and Compliance in Washington State**

13    29.    As previously described and as reflected in Initiative 276, there is very strong

14    public support for disclosure in Washington State.  There is also a culture of compliance by

15    PDC filers with the statutes and rules.  During FY 2009, for example, 99.3 percent of

16    candidates, lobbyists, lobbyist employers and public officials met statutory filing deadlines.

17    30.    Another example of the disclosure and compliance culture here is reflected in

18    the results of a recent limited scope audit conducted by PDC staff of four 2008 statewide

19    candidate campaigns.  The staff queried the PDC contribution database to review the C3

20    (contribution) reports, including checking compliance with providing name and address

21    information for contributors giving more than $25 as required by RCW 42.17.090(1)(b), and

22    compliance with disclosing employer and occupation for individuals contributing more than

23    $100 as required by WAC 390-16-034.  With respect to providing required name and address

24    information at the more than $25 level, the compliance rate ranged from 100 percent to 99.64

25    percent.  With respect to providing occupation and employer information of individuals

26    donating more than $100, the compliance rates ranged from 92.7 percent to 99.67 percent.

While only four candidate campaigns were examined, these audit results do reflect an overall high degree of compliance by filers in disclosing information required by statute and rule. Nevertheless, this 2008 limited scope audit showed results consistent with other audits and reviews, again underscoring Washington's culture of disclosure and compliance.  For example:

- In 2008 random audits of 16 state legislative election contests were conducted by PDC staff.  These audits included eight State Senate campaigns and eight State Representative campaigns and revealed a 93 percent compliance rate in the timeliness of contribution disclosure and deposits.  The only minor exceptions in the audits were in the areas of reporting orders placed, debits or obligations and the timeliness of last minute contributions.

- A review by PDC staff of 2008 C6 reports used to disclose independent expenditures and electioneering communications revealed a 95 percent overall compliance rate.  That review included an examination of substantial compliance with timeliness of filing of the reports, plus inclusion of the critical and statutorily required information on the reports.

- In 2006 a random audit was conducted by PDC staff of L5 forms used to disclose lobbying by public agencies.  Four of the five agencies reviewed substantially complied with the lobbying disclosure filing requirements.  The reason for some "exceptions" noted for one agency was a misunderstanding by the agency filer regarding the calculations of lobbying days.

These audit and review results are available on the PDC's website at www.pdc.wa.gov under "Enforcement and Compliance."

31.    This compliance is due not only to the recognition by candidates and political committees that disclosure is expected by the voters, but also to the many tools the PDC provides to assist filers in compliance.

**Campaign Finance Reporting Generally Including Disclosure of Cash Receipts and Contributions**

32.    To describe campaign finance reporting in general, RCW 42.17 provides reporting of campaign finance information at defined intervals.  See, e.g., RCW 42.17.080. Reporting includes providing the PDC, and thus the electorate, information by candidates and political committees, including ballot measure committees, concerning contributions and

1   expenditures on "C3" (contribution) and "C4" (expenditure) reports.   The contents of the

2   reports are contained in RCW 42.17.090.   Exhibit D.   There are two reporting options.   There

3   is "full reporting" and "mini reporting" (which requires only the registration statement to be

4   filed).   Full reporting simply includes (1) completing the initial registration form if you are a

5   candidate or political committee, (2) designating a treasurer, and (3) filing regular reports

6   pursuant to a schedule.   The "mini reporting" option is available to filers, including political

7   committees, who during a calendar year raise and spend no more than $5,000 and receive no

8   more than $500 from any one contributor.   This "mini reporting" enables candidates and

9   campaigns raising and spending small amounts of money to be exempted from filing

10  contribution and expenditure reports.   Mini reporting is authorized under RCW 42.17.370(8),

11  WAC 390-16-105 and other PDC rules.

12        33.     The dates for full reporting are those for which certain reports are due to be

13  filed with the PDC.   With respect to electoral campaign activity, this scheduled reporting

14  enables the data to come in at the same time for similar entities (candidates, political

15  committees, persons making independent expenditures, etc.) to enable the public to see, at the

16  same time for similar filers, who the participants are (such as through filing candidate or

17  committee registration forms), what money is flowing in and from whom (such as through

18  reports of contributions to candidates and committees), and what money is flowing out (such as

19  through expenditure reports).   Regular reporting by filers also enables the PDC, the public, and

20  the media to obtain updated totals of dollar amounts at regular and predictable intervals, in

21  order to enable comparisons between campaigns or other spenders (such as those making

22  independent expenditures).   Regular reporting also gives the public an opportunity to "cross

23  check" contributions of a committee as compared to its expenditures – is money that was

24  contributed being expended for its anticipated purpose?   Reporting in this manner enables the

25  public to see both sides of the equation.   It also enables the public to  have an important role in

26  the "checks and balances" of campaign financing – it allows the public, as well as the PDC, to

1   verify accounting of funds received and expended with respect to elections, without having any

2   need for a full audit of all campaigns and committees by a government agency.  In some ways,

3   this is not unlike laws that require charities to report on how their funds are used because they

4   make it possible for the public to not only "follow the money" overall but also to follow money

5   to entities they contributed to.

6        34.    Enabling the public to "trust but verify" is an important piece of why disclosure

7   on reports, at regular intervals, is a cornerstone of the statutory reporting requirements.  This is

8   equally important in ballot measure campaigns, particularly given the amount of money that

9   flows in and out.  For example, in 2002, the PDC referred a high profile enforcement case to

10  the Attorney General's Office where the public's contributions to the ballot measure committee

11  were unlawfully used by an officer for his personal expenses for activities unrelated to the

12  campaign, and those facts had been concealed from the public by the committee's treasurer and

13  the officer.  That case at the administrative level was PDC Case No. 02-281, *In Re the Matter*

14  *Of Enforcement Against Permanent Offense PAC, Permanent Offense, Inc., Traffic*

15  *Improvement Initiative Committee, and Tim Eyman*.

16  **Pursuant to RCW 42.17.090(1)(b), Disclosure of Contributions on C3 Reports Includes**
    **Names and Addresses of Contributors Giving More Than $25**

17       35.    With respect to reporting contributions, the C3 report (copy at Exhibit E)

18  provides important information to the public about who is contributing and how much.  This is

19  true both for ballot measure campaigns as well as candidate campaigns.  Providing such

20  information to the public was a core purpose of Initiative 276.

21       36.    The C3 report describes cash receipts and monetary contributions.  It is a form

22  adopted in WAC 390-16-031 and is required under RCW 42.17.080(3), RCW 42.17.090 and

23  WAC 390-16-034.  This form provides such information as follows:

24  • monetary contributions, loans, notes, and security agreements;
    • for contributions over $25, the contributor's name and address;

25  • for contributions of more than $100, the contributor's occupation,
      employer's name and location; and,

26

---

DECLARATION OF DOUG ELLIS                    15
NO. C09-5662 RBL

- if anonymous contributions are received (which sometimes occurs, for example, at "pass the hat" fundraisers). (Under RCW 42.17.060, political committees can receive anonymous contributions up to 1 percent of their yearly contributions or $300, whichever is greater.)

Further details can be provided on attachments to the C3 form. Currently, electronic filing is used very effectively by many campaigns to submit the C3 reports.

37. As noted, the report of contributions requires disclosure of those making contributions, if the reporting threshold is met. RCW 42.17.090(1)(b), the specific provision challenged by Family PAC, provides that filers shall disclose on C3 reports the following information concerning contributions, among the list of other items:

> The **name and address of each person who has made one or more contributions** during the period, together with the money value and date of such contributions and the aggregate value of all contributions received from each such person during the campaign or in the case of a continuing political committee, the current calendar year: PROVIDED, That pledges in the aggregate of less than one hundred dollars from any one person need not be reported: PROVIDED FURTHER, That the income which results from a fund-raising activity conducted in accordance with RCW 42.17.067 may be reported as one lump sum, with the exception of that portion of such income which was received from persons whose names and addresses are required to be included in the report required by RCW 42.17.067: **PROVIDED FURTHER, That contributions of no more than twenty-five dollars in the aggregate from any one person during the election campaign may be reported as one lump sum so long as the campaign treasurer maintains a separate and private list of the name, address, and amount of each such contributor:** PROVIDED FURTHER, That the money value of contributions of postage shall be the face value of such postage;

(Emphasis added.)

Thus, at more than $25, the name and address of the contributor is to be provided if a campaign is doing full reporting (and not filing under the "mini reporting" option). The current $25 figure was provided by the Legislature in RCW 42.17.090(1)(b) in 1982 (increasing it from $10), and then was changed to "no more than twenty-five dollars" in 1989. Laws of Washington 1982, c. 147, § 7; Laws of Washington 1989, c. 280 § 9.

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

16

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1    38.    Providing voters the name and address of contributors accomplishes several

2  purposes of RCW 42.17.  First, it provides voters and the media the information enabling them

3  to "follow the money" back to its original source.  It helps voters, media and others answer

4  election questions such as:  Is a candidate or campaign receiving most of its money from a

5  particular person or group of persons, a particular neighborhood or city, or a particular region

6  of the state?  What amount of contributions to a campaign is coming from persons outside of

7  Washington State?  What states are those contributors from?  What does that say about the

8  candidate or campaign?  Such data makes real the original purposes of Initiative 276.  The

9  previous PDC Executive Director, Vicki Rippie, also testified in her declaration filed in this

10  matter in response to the temporary restraining order/permanent injunction motion that

11  providing the names and addresses of the contributors to the voters enables them to "follow the

12  money" received by political committees and also to determine if in fact the contributors or

13  entities are really one or closely related.  Rippie Decl. ¶ 7.  She gave a specific example related

14  to Family PAC.  Rippie Decl. ¶¶ 8 – 13.

15    39.    Second, providing the names and addresses supplies data that enables PDC staff

16  and others to conduct analysis providing even more information to voters.  For example,

17  because contributor addresses including zip codes are provided, PDC staff was able to develop

18  a "Gubernatorial Money Map."  The map is available on the PDC website and enabled voters

19  to easily observe which counties the contributions were coming from for each candidate in the

20  2008 gubernatorial election.  See more details about the map in the Declaration of Michael

21  Smith.

22    40.    Third, Family PAC claims that the state --- thus Washington voters --- have

23  only a limited compelling informational interest at the more than $25 (and more than $100)

24  level and argues those levels should be adjusted upward.  PDC data and information from the

25  voters do not support those claims.  I will first address the more than $25 level, and in the next

26  section regarding WAC 390-16-034, I will address the more than $100 level.

41.     As Mr. Smith also attests in his declaration, the PDC website that provides access to reports filed with the PDC including ballot measure contribution and expenditure reports, has an extremely high rate of use by the public.  That use includes the "View Actual Reports" and "Search the Database" options which enable the public to look at copies of actual reports filed, as well as the compiled information in the database.  These reports include disclosure at the more than $25 (and more than $100) thresholds as described herein.

42.     To my knowledge since I have been at the PDC beginning in June of 1992, I am not aware of any significant efforts by the members of the public or voters requesting the Commission to increase the $25 and $100 amounts after they were implemented, or based upon evidence that there no longer is any interest by the voters in disclosure at those levels.  There are a variety of ways that requests could have been made, including a request directed to the Commission or a rulemaking petition.  To the best of my knowledge at this time, I am not aware of information showing that filers, campaigns, the media, legislators or others have requested the more than $25 amount be adjusted upward.

43.     In addition, the PDC has received numerous national awards for the level of disclosure the PDC provides overall, indicating the state and national informational interest in the disclosure of information on Washington State campaigns and commending the state for providing such information.  There has been no "hue and cry" among participants in the Washington State campaigns that the more than $25 figure for disclosing names and addresses is too low.

44.     In Initiative 276 in 1972, the first reporting threshold for contributions in Section 9 was more than five dollars.  It was later raised to $10, then as noted the $25 figure was provided by the legislature in RCW 42.17.090(1)(b) in 1982 (increasing it from $10), changing it to "less than twenty-five dollars" in 1982, and then changing it to "no more than twenty-five dollars" in 1989.  That more than $25 disclosure figure provides voters access to a large amount of information regarding the financing of campaigns.  As in 1989, providing

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

18

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

today's voters such information continues to give them access to data about who is really funding campaigns.  For example, in the 2008 Washington State election, more than $1.4 million was contributed by persons giving between $25.01 and $30 in 54,502 contributions, according to our database.  Exhibit F.  That is, barring voters from receiving information concerning the name and address of contributors in just the $25.01-$30 range would deny them information regarding the true sources of almost $1.5 million in just one election year in our state.

45.    Disclosure of names and addresses at the more than $25 level assists in enforcing other provisions of RCW 42.17.  As noted, it gives not only voters --- but also PDC staff --- access to the reported sources of millions of dollars in campaign contributions, enabling staff to check compliance with other laws such as those prohibiting concealment.

46.    Disclosure of names and addresses at the more than $25 level provides sunlight on who is actually financing campaigns and to what extent, thus providing information to help persons analyze what this means for elections.  Are there many smaller contributions?  Are there a few larger contributors?  Are there differences in smaller vs. larger contributors' interests in the campaign, candidate or ballot measure?  In my view, providing data to answer these questions is becoming increasingly important now that more campaigns are reported to be seeking higher volumes of smaller contributions particularly when they can be easily provided online.  This reported experience (high amounts of small donors giving particularly online) is sparking interest in the political science and legal communities, enabling them to analyze what this means for future campaigns and elections.  Here are some examples of reports and articles commenting on this recent reported experience:

   a. The *Campaign Finance Institute's* "Small Donor Project" 2008 report titled "Do Small Donors Improve Representation?  Some Answers from Recent Gubernatorial and State Legislative Elections" (report available at http://www.cfinst.org/pdf/books-reports/APSA_2008_SmallDonors.pdf) ("CFI Report").

The CFI Report describes various studies that have looked at the recent interest by campaigns in a higher volume of smaller campaign contributions (defined as $100 or less for the purposes of the Report).  This CFI Report also provides:

- In the seven states studied (Arizona, Colorado, Connecticut, Iowa, Minnesota and Pennsylvania) most of them require reporting of names and addresses when the contributors give in the range of $20 -$50 per year. (P. 7).
- As with past federal research, the CFI Report showed that the more affluent the household, the higher the contribution.  (P. 9).
- When contributing, large donors (defined as those giving at least $500, for the purposes of the CFI Report) consider the benefits for their own business, industry or job far more important than small donors.  (P. 13).  Candidates' ideological orientations and positions on social and moral issues exert more influence on the giving of small donors than of large donors.  (P. 14).
- The CFI's website on small donors also shows that in the 2006 legislative elections in Washington State, nine percent of the contributors gave $100 or less.

b. November 24, 2008 CFI Press Release, "Reality Check: Obama Received About the Same Percentage from Small Donors in 2008 as Bush in 2004" at http://www.cfinst.org/Press/PReleases/08-11-24/Realty_Check_-_Obama_Small_Donors.aspx.
This second CFI publication regarding the Obama campaign reviewed Federal Election Commission data which showed that the volume of small contributions to the Obama campaign was less than originally reported by the news media.  This release also described that in CFI's view and contrary to news reports, although the Obama campaign did not rely upon the majority of the financing of the campaign from small contributors, it was accurate to recognize that campaign's success in using online mechanisms to seek contributions, stating as follows:

None of these findings denies the importance of either Obama's appeal to repeat donors or his innovative use of online social networking tools to interweave appeals for contributions and critically important campaign volunteers. In particular, Obama did attract repeaters who have not been part of the traditional large-dollar, reception-attending fundraising crowd. The fact is that Obama's financial juggernaut broke records at all contribution levels. The reality does not match the myth, but the reality itself was impressive.

c. November 25, 2008 article "Obama Fundraising and the 'Small Donor':  Strange Views from the Campaign Finance Institute," *More Soft Money Hard Law* website (of the Perkins Coie law firm) at http://www.moresoftmoneyhardlaw.com/news.html?AID=1378.

To contrast with the CFI press release, in the author's view in this article the CFI release and data studied actually documented that "small donors fueled the [Obama] campaign's extraordinary success in amassing in the neighborhood of $650 million."

d. The 2010 report titled "Reform in An Age of Networked Campaigns," a Joint Project of the *Campaign Finance Institute, American Enterprise Institute*, and *Brookings Institution* ("Joint Project Report") available at
http://www.cfinst.org/books_reports/Reform-in-an-Age-of-Networked-Campaigns.pdf
The Joint Project Report described that federal candidate Obama experienced a "surge" of small contributions in the latter quarter of his campaign, once he became a principal challenger to the other candidates.  (P. 18).  The Joint Project Report also reported that for states conducting gubernatorial and legislative elections in 2006 (Washington was not included), donations in the $1 - $100 range varied from two percent (Alabama) to 45 percent (Minnesota).  The Joint Project Report made a series of recommendations, including many Washington already adopted (establishing a website for campaign finance and election information, requiring electronic filing and making reports available in real-time, providing filers free software, establishing contribution limits, and others.)

In sum, these reports are current examples of the public interest in the volume and potential impact of higher volumes of smaller contributions, particularly those donated online. Therefore, in my view, retaining disclosure mechanisms and particularly at this time enables this analysis of small donors in campaigns to continue.

47.     Finally, this changing campaign contribution online dynamic particularly for smaller contributors presents a potentially new and easy means to corrupt the campaign financing and disclosure process.   That is, one person could potentially make serial contributions online anonymously or under false names in an effort to circumvent transparency and limits ("bundling").     See *Los Angeles Times* online story at http://articles.latimes.com/2008/oct/09/nation/na-money9 titled "Obama's Fundraising Prowess Exposes Flaws in Law" (October 9, 2008) describing that the $200 federal campaign level for disclosure makes it impossible to determine if the millions of dollars the Obama campaign received from contributors giving funds at lower than the federal threshold (and often via the Internet) were from real persons, or persons qualified to contribute.  Exhibit F-1.  Requiring the

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

21

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1   name and address of the contributor at "smaller amounts" helps avoid the corruption that

2   online "bundling" can present, and can lead an investigator back to the source if a complaint of

3   "bundling" or concealment is filed with the agency.

4        48.     Family PAC states the more than $25 amount should have been adjusted by the

5   Commission.  RCW 42.17.370(11) empowers, but does not require, the Commission to revise

6   at least once every five years but no more often than every two years, the monetary reporting

7   thresholds and reporting code values of RCW 42.17.  Those adjustments, if and when made,

8   are accomplished by rule regarding three categories (campaign finance, lobbying, and personal

9   financial affairs disclosures) and are to equally affect all thresholds within each category.  A

10  separate requirement to adjust biennial dollar amounts for contribution limits that were part of

11  Initiative 134 (Laws of Washington, 1993, c. 2, § 9) at the beginning of each even-numbered

12  calendar year was codified in RCW 42.17.690 and those adjustments are reflected in

13  WAC 390-05-400.  The $25 provision was not part of Initiative 134.

14       49.     With respect to the more than $25 figure, Family PAC is correct that neither the

15  Commission nor the legislature have increased that amount since it was last considered by the

16  Legislature in 1989.  However, in 2010 the Legislature passed a major rewrite of RCW 42.17

17  and did not modify the disclosure threshold provided in law.   Chapter 204, Laws of

18  Washington 2010.  To the best of my knowledge, and certainly since I have been at the PDC

19  since 1992, it has not been struck down by any court.  To the best of my knowledge and

20  certainly since I have been at the PDC since 1992, there also has been no hue and cry by filers,

21  campaigns, candidates, ballot measure sponsors, or the public to adjust this disclosure

22  threshold.  In fact all indications are that the voters' interest in more --- not less --- disclosure

23  remains very high.  At this time, I am not aware of evidence presented to the Commission, or

24  the legislature, indicating voter dissatisfaction with this disclosure threshold.  I am not aware of

25  any such rulemaking proposals, or other similar input to the Commission.

26

DECLARATION OF DOUG ELLIS         22          ATTORNEY GENERAL OF WASHINGTON
NO. C09-5662 RBL                               1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

**Pursuant to RCW 42.17.090(1)(k), RCW 42.17.370(1) and WAC 390-16-034, Disclosure of Contributor Occupation and Employer for Contributors Giving More Than $100**

50.    RCW 42.17.090(1)(k) provides that in addition to the information listed in the statute, a filer shall also disclose "Such other information as shall be required by the commission in rule in conformance with the policies and purposes of this chapter." RCW 42.17.370(1) also provides that the Commission is empowered to "Adopt, promulgate, amend, and rescind suitable administrative rules to carry out the policies and purposes of this chapter, which rules shall be adopted under chapter 34.05 RCW." One of the purposes of the chapter is to effect disclosure to the voters of who is financing campaigns. RCW 42.17.010. One such rule adopted under these disclosure statutes is WAC 390-16-034, the rule Family PAC is challenging.

51.    The Commission adopted WAC 390-16-034 to require disclosure of the occupation and name and address of the employer of persons who contribute to election campaigns for those giving more than $100. The rule currently reads:

> **WAC 390-16-034 - Additional reporting requirements.**
> Pursuant to RCW 42.17.090, each report required under RCW 42.17.080 shall disclose, in addition to the name and address of each person who has made one or more contributions in the aggregate amount of more than one hundred dollars, the occupation and the name and address of the person's employer.

52.    The rule has been the subject of significant public, stakeholder, legislative and media consideration and review, particularly in 1993-94 (see some examples --- but by no means all --- of consideration in 1993-94 at Exhibits 3 and 6 to Bieniek Declaration). The rule has remained in its current format since 2001. Here is a brief history of the rule to the best of my knowledge at this time.

a. **1993.**    At its October 26, 1993 meeting, after filing the proposed rule and conducting public hearings, the Commission adopted WAC 390-16-034. It was to become effective in December 1993. Among other things, the Commission considered information concerning states where employer disclosure was required, Federal Election Commission requirements (also see FEC reference in

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

23

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

Exhibit 6, page 27 of Bieniek Declaration), stakeholder input, and other information.

b. **1994**.  After the rule was adopted, additional public input was received, including from legislators who pointed out that the legislature was considering similar but slightly different provisions in House Bill 2317 and Senate Bill 6112.  Another bill was introduced, House Bill 2904, on the same subject.  As a result, there were requests that the Commission stay implementation of the rule until the legislature could decide if it wanted to act concerning this reporting of additional campaign information.  Therefore, the Commission adopted a motion at its January 25, 1994 meeting to stay implementation until close of the 1994 legislative session.  The media was critical of this decision.  Exhibit G.

c. No action was taken by the Washington State Legislature during the 1994 legislative session to respond to the rule, by amending RCW 42.17 in particular RCW 42.17.090.  While some bills were introduced on the subject, they did not pass.

d. As a result, at its March 22, 1994 meeting, the Commission re-instated the rule prospectively.  Legislators were informed that in deciding to proceed in implementing the rule, the Commission had considered that:

> (1) it acted within its statutory authority and in accordance with rulemaking requirements;
> (2) the Legislature had not provided conclusive guidance during the last session on the subject;
> (3) the rule had been adopted to advance full disclosure of financial support of ballot measures as well as candidates; and,
> (4) the rule had public support.  Exhibits H-1 and H-2.

e. Some legislators expressed some interest to study the issue again in preparing for the 1995 legislative session.  Therefore, in September 1994, PDC staff provided testimony to the House of Representatives State Government Committee regarding the occupation and employer requirement in the rule.  Exhibit I (Family PAC made its own edits to this exhibit at Exhibit 6, pages 20-26 in the Bieniek Declaration).  The purpose of the requirement in the rule was described at that legislative committee hearing as:

> (1) providing the electorate with information to aid them in evaluating candidates and issues and help them place the candidate or issue within the political spectrum, particularly with the adoption of contribution limits;
> (2) providing the public information about the interests of persons who are making contributions to candidates and political committees;

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

24

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

(3) consistent with the recommendations of the "Money in Western Politics Project" conducted by the Western States Center which had analyzed Initiative 134 and which was critical that the disclosure requirements did not provide employer and economic interests of contributors; and,

(4) providing more information to assist in enforcement of RCW 42.17 (e.g. regarding efforts to conceal the true source of contributions).

In sum, the PDC testimony described that the occupation and employer disclosure promotes full and meaningful disclosure, deters violations of the contribution limits and concealment laws, and provides a means of detecting wrongdoing when it occurs. These reasons are also discussed in the *Seattle Times* news article at Exhibit 6, pages 15 – 19 attached to the Bieniek Declaration. With respect to ballot measures, the PDC testimony provided that although there are no campaign contribution limits with ballot measures, these campaigns are still subject to abuses, including concealment activities. The legislative committee was also provided information about the reporting modification process under RCW 42.17.370. Family PAC attached a bill that passed in 1995, Engrossed Substitute Senate Bill 5684, with a Governor's veto message of Section 3 highlighted by Family PAC. The Governor described the section was being vetoed because employer and occupational information is critical to identifying and disclosing patterns of coordinated contributions, and the PDC has the authority to require such information in rule. Bieniek Declaration, Exhibit 6, page 103.

f.   **1996.**  The rule was amended in 1996 to correct a statutory cross reference.

g.   **2001.**  The rule was amended again in 2001 to update statutory references and to change "one hundred dollars or more" to "more than one hundred dollars" after receiving input from stakeholders and determining this one penny adjustment would not result in a significant loss of information and would streamline reporting for campaign treasurers. Exhibit J.

h.   **2002.**  A bill was introduced in the legislature to amend RCW 42.17.090 in order to return the reporting threshold to "$100 or more" (instead of the "more than $100" as the Commission amended in the rule in 2001) and to exempt the provision from the adjustments in RCW 42.17.370(11). House Bill 2617. The bill passed the House but did not pass the Senate. As a result, the "more than $100" reporting threshold in the rule remained. I recall our review at that time of the Federal Election Commission's reference manual <u>Campaign Finance Law 2000</u>, showed that 32 states required some type of occupation and employer reporting thresholds, 5 at less than $100, 1 at $100 or more, 23 at more than $100, and three had other qualifications.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

     i.   **Status as of 2010.**  To the best of my knowledge, no rulemaking petition has been submitted to the Commission to request amendments to or repeals of WAC 390-16-034 to address the occupation and employer language or to adjust the $100 figure.  In sum, and with the legislature's knowledge, this reporting provision has remained at more than $100 since 2001.  While Family PAC attached copies of <u>some</u> of the extensive discussion in 1993-94, since that time, occupation and employer disclosure has become part of the Washington State political campaign culture.  In fact, despite one jurisdiction's  initial reservations in 1993-94 (see City of Seattle input at Bieniek Declaration, Exhibit 6), the Seattle Ethics and Elections Commission website at http://www2.seattle.gov/ethics/elpub/el_home.asp now provides occupation and employer information online for Seattle elections.

     53.     Occupation and employer data gives voters the opportunity to look at patterns of contributions and the occupation and employer of contributors to whom a candidate appeals in order that they may learn more about the candidates and make more informed judgments. Such data reveals patterns of contributions to political committees from persons with common economic interests.  A good example of the use of this data is the recent study issued January 28, 2010 by the *National Institute on Money in State Politics* titled "Judicial Diversity and Money in Politics:  AL, GA, H, NM, NC, OH, WA, WI."  Study at http://www.followthemoney.org/press/ReportView.phtml?r=413.  The study analyzed women and minority judicial candidates and their ability to raise campaign contributions.  To compile the report, data on campaign contributions and expenditures in judicial races was accessed from various states including Washington.  The report described that, "The Institute currently receives its Washington data from the Public Disclosure Commission."  The study reported that with respect to the 2008 Washington State Supreme Court races, "Lawyers gave $123,381; law firms accounted for 60 percent, which is $52,933 of the $79,220 given by businesses and special interest groups."  Exhibit K.  With respect to the Court of Appeals candidate campaigns, the report described that "Lawyers gave $9,390 of the $60,329 given by individual donors; law firms gave 63 percent ($19,243) of the $30,534 given by businesses and special interest groups."  This useful information about <u>who</u> was giving in these judicial races and

DECLARATION OF DOUG ELLIS          26          ATTORNEY GENERAL OF WASHINGTON
NO. C09-5662 RBL                                    1125 Washington Street SE
                                                    PO Box 40100
                                        Olympia, WA 98504-0100
                                        (360) 664-9006

what their interests are was available to the research institute and to the voters because Washington State requires disclosure of the occupation and employer of individuals contributing more than $100.

54.     This occupation and employer disclosure provision also gives voters the same types of information concerning who is supporting or opposing ballot measures.  For example, if mainly doctors support an initiative and mainly lawyers oppose it, that information is disclosed on reports filed with the PDC and is a valuable piece of information for voters.

55.     It is my understanding that still over one-half of the states require reporting of the occupations and employers of contributors in some manner.

56.     The occupation and employer data also enables voters to otherwise "follow the money" to see if a contribution is really coming from a contributor, or perhaps really from the contributor's employer.  That is, it enables the voters as well as PDC staff to find out if in fact the employer or union is "fronting" the money to its employees or members for the contributions, in order to circumvent contribution limits or disclosure.  One example is provided in a PDC enforcement case, *In Re PJ Taggares Co. and Pete Taggares, Sr.*, PDC Case No. 97-202.  This case is also discussed in the *Seattle Times* news article at Exhibit 6, page 17 of the Bieniek Declaration.  In 1996, in viewing information filed with the PDC by gubernatorial candidates, PDC staff discovered that on December 8, 1995 candidate Dale Foreman had received $15,500 in contributions from the PJ Taggares Company, some of its subsidiaries, employees and relatives.  Exhibit L.  Foreman campaign reports showed they all contributed $1,000 each (with one person contributing $500).   In the investigation, one Taggares employee testified his contribution exceeded what he earned in a two-week period, and he made the contribution solely at the suggestion of Mr. Taggares.  The payroll records manager testified he was told some of the employees had received "bonuses" and others said they were "loans" from Mr. Taggares.  Other financial arrangements were allegedly made between Mr. Taggares and his employees to repay the contributions.  The purpose of these

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

27

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

activities was determined to be to conceal the true source of contributions and to secretly exceed contribution limits.  The information that first brought this scheme to light was the disclosure of the common employer information.  A civil penalty was assessed by the Commission for actions related to several of the employees.

**RCW 42.17.105(8)'s 21-Day/$5,000 Timing Disclosure Provision**

57.    Family PAC also challenges RCW 42.17.105(8).  That provision currently reads:

> It is a violation of this chapter for any person to make, or for any candidate or political committee to accept from any one person, contributions reportable under RCW 42.17.090 in the aggregate exceeding fifty thousand dollars for any campaign for statewide office or exceeding five thousand dollars for any other campaign subject to the provisions of this chapter within twenty-one days of a general election. This subsection does not apply to contributions made by, or accepted from, a bona fide political party as defined in this chapter, excluding the county central committee or legislative district committee.

58.    To the best of my knowledge, RCW 42.17.105(8) was first enacted by the legislature in 1985, and was amended in subsequent years (1986, 1989, 1995) to read as above. RCW 42.17.105 was otherwise amended in 2001 and 2010.  That is, this statutory section and provision has been the subject of consideration and review, as well as some amendment, by several legislatures.  Over the years, it has also been a statute reviewed in interpretive statements issued by the Commission.  See, e.g., PDC Interpretation No. 95-02 (regarding transfers of candidate surplus funds), No. 96-04 (concerning the "within 21 days" calculation) (copies available on PDC website at www.pdc.wa.gov.).  Over the years, it has also been the subject of enforcement cases.  Information about the statute is also available on the PDC website, and that website has been operational since 2000.  In essence, this provision has been subject to, or available for, considerable legislative, voter and public awareness and scrutiny over many years.

59.    It was and remains essentially a timing and disclosure provision.  It is my understanding that a purpose of RCW 42.17.105(8) was to "push the big money" out early, so

DECLARATION OF DOUG ELLIS
NO. C09-5662 RBL

28

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1   voters could have timely access to such information about big contributors before voters cast

2   their ballots and have access to information as to who is making large contributions in order to

3   effect the outcome of the election at the last minute.  See, e.g, Exhibit 4 attached to Bieniek

4   Declaration.   However, when RCW 42.17.105(8) was first adopted, the state did not have

5   contribution limits.  In addition, most ballots were cast at polls at that time, not by mail.  Since

6   then, contribution limits (except for ballot measure campaigns) were enacted through the

7   passage of Initiative 134 in 1992 and are currently codified in RCW 42.17.640, with later

8   limits for judicial campaigns codified at RCW 42.17.645.  The 2010 legislature also enacted

9   contribution limits for local and county candidates effective June 10, 2010.  Chapter 206, Laws

10  of Washington 2010.   And, as I have described, since then, 38 of Washington State's 39

11  counties now vote by mail.  Exhibit M.  This means it is particularly important for the voters to

12  have access to who the large contributors are at the time they are voting, and

13  RCW 42.17.105(8) provides a disclosure provision to enable that information to be available.

14      60.    As a result of the contribution limits, today, this timing provision in

15  RCW 42.17.105(8) has a more limited application than when originally enacted.   It now

16  applies to contributions received by ballot measure committees, political parties, political

17  committees including independent expenditure committees, and to candidates in some smaller

18  jurisdictions.

19      61.    This timing provision in RCW 42.17.105(8) does not apply to expenditures.

20  This timing provision does not apply to non-candidates spending their own money on an

21  independent expenditure (such as persons who do not contribute to an independent expenditure

22  committee but simply make their own expenditures such as for an advertisement).

23      62.    It is not unusual to have a timing provision as part of a campaign finance

24  program.  Campaigns themselves are targeted to an event with a specifically timed occurrence

25  – the date of a primary, special or general election.  Here are some examples:

26

1

2

- RCW 42.17.710 provides that no contributions can be made to legislators for a period prior to and during a legislative session.

3

4

5

6

7

- "Election cycle" is defined at RCW 42.17.020 as "the period beginning on the first day of January after the date of the last previous general election for the office that the candidate seeks and ending on December 31st after the next election for the office.  In the case of a special election to fill a vacancy in an office, 'election cycle' means the period beginning on the day the vacancy occurs and ending on December 31st after the special election."  The "election cycle" time period is relevant because of contribution limits per election cycle under RCW 42.17.640.

8

9

- Contributions for a primary election cannot be made after the primary, with certain exceptions.  RCW 42.17.640(2).

10

11

- Electioneering communication disclosures in state law apply when those types of political ads occur "during the sixty days before an election." RCW 42.17.020(20)(c).

12         63.     This timing provision in RCW 42.17.105(8) is still useful in the campaigns and

13   entities it covers and particularly for campaigns not subject to contribution limits such as ballot

14   measure campaigns.  It is even more useful today, when the majority of voters vote by mail.

15   According to the Secretary of State's website, ballots are mailed at least 18 days before an

16   election, and 38 of the state's 39 counties vote by mail.  Exhibit M.  So, the opportunity for

17   those voters to see where the big money is coming from for those campaigns still subject to

18   RCW 42.17.105(8) is enhanced due to the 21-day time period in that statute.

19         64.     The one challenge I am aware of to RCW 42.17.105(8) occurred in state

20   superior court and concerned whether the provision applied to certain political party activities.

21   The court held that it did.  I am not aware any appeals were filed.  *Republican State Committee*

22   *of Washington and Kenneth O. Eikenberry v. PDC*, Thurston Cy. Superior Court No. 94-2-

23   03201-9 (written opinion June 24, 1996).  Except for the present lawsuit, I am not aware at this

24   time of other legal challenges to RCW 42.17.105(8) in the many years it has been in place in

25   Washington State.

26

65.     Family PAC argues that there is "confusion" over when the 21-day period begins and ends, relying upon 1996 discussion.  Bieniek Declaration Exhibit 5 (Plaintiff's Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment, footnote 5).  That discussion involved a 1992 interpretation which had been inadvertently overlooked, and was corrected in 1996.  Bieniek Declaration Exhibit 5, page 5. That discussion was more than 14 years ago and I am not aware of any confusion expressed by Family PAC.

**Family PAC's Inaction Seeking Commission Guidance, Rulemaking, a Modification, or Mini Reporting; Its Inaction Seeking Legislative Changes; Its Inaction in Conducting Campaign Finance Activity in Washington State; and, Its Inaction in Responding to Information in September 2009 Regarding RCW 42.17.105(8)**

66.     Based on my personal knowledge, and to the extent I can determine, Family PAC has not contacted the PDC seeking an informal advisory opinion or formal declaratory order from the Commission on any of the subjects of this lawsuit, or submitted a rulemaking petition seeking any changes to the name, address, occupation and employer disclosure requirements.  To my knowledge, Family PAC has not submitted a request for an interpretive statement.   While it has provided information concerning other political committees' modification requests under RCW 42.17.370(10) (Bieniek Declaration Exhibit 7), it has not submitted any modification request to modify its reporting requirements.  To my knowledge, Family PAC has not sought the mini-reporting option.  I am not aware of any testimony or proposals that Family PAC has offered to the legislature, seeking any changes to RCW 42.17.

67.     To the best of my knowledge, the Complaint filed by Family PAC in this matter was the first notice the PDC had that Family PAC would seek to enjoin the statutory and rule provisions at RCW 42.17.090(1)(b), WAC 390-16-034, and RCW 42.17.105(8).   The Complaint was filed the same day that  PDC records show Family PAC filed its first and only report with the PDC, its political committee registration form (C1pc).  While it described itself as a "continuing political committee" in fact, since the filing of this lawsuit, it has filed no

1  additional reports and thus shows no other campaign-finance related activity, including activity

2  regarding campaign contributions.

3      68.    To the best of my knowledge, Family PAC never argued or presented to the

4  PDC, except for this lawsuit, any alleged burdens in complying with RCW 42.17 or the PDC's

5  rules in Title 390 WAC.  I have reviewed the declaration of Mona Passignano filed in this

6  matter.  Prior to this lawsuit, I had not heard of Ms. Passignano and to my knowledge she

7  expressed no concerns to the PDC about compliance with RCW 42.17 or Title 390 WAC.  I

8  also observe her declaration describes that "Focus on the Family Action" ("Focus Action" now

9  called "Citizenlink") was "eventually able to participate in the Referendum 71 campaign"

10  despite the statute challenged here at RCW 42.17.105(8).  In addition:

- Ms. Passignano described that Focus on the Family works with state-based organizations called "Family Policy Councils" and "including the one in Washington State" which is directed by Joseph Backholm (one of the attorneys in this lawsuit).  According to the Citizenlink's website at www.citizenlink.org, the Family Policy Council for Washington State is the Family Policy Institute of Washington, Joseph Backholm Executive Director, address 16108 Ash Way, Suite 111A, Lynnwood, WA, 98087.  Exhibit N (website page).

- As provided in the declaration of Vicki Rippie filed in this matter, the above address is the same street address and contact for Family PAC and "FPIW Action."  At the time of her declaration (October 26, 2009), she described that Family PAC shares an address and officer/attorney and apparent email address with entities that had contributed $200,000 to the effort seeking to defeat Referendum 71 (to the "Vote Reject on R-71 Committee").  Those contributions were received on October 8, 2009.  Declaration of Vicki Rippie.

- The Family Policy Institute's website at www.fpiw.org also provides a "Citizens Guide" dated September 2009 titled "Vote to Reject Referendum 71."  Copy at Exhibit O.  September 2009 is also the same time Ms. Passignano states that Focus Action "began its efforts regarding Referendum 71 in earnest" and discussed with Mr. Backholm making a campaign donation.  September 2009 is also the same time PDC staff member Lori Anderson recalls receiving a phone call from one of the attorneys representing Family PAC in this lawsuit, inquiring about RCW 42.17.105(8) and she described when in October 2009 (starting October 13) the 21-day time period became effective.  See Declaration of Lori Anderson.

- The "interconnectedness" of these organizations, and to another organization called Protect Marriage Washington is also described in the Declaration of Anne Levinson filed in this matter (paragraphs 9-15). She also describes that Dave Mortenson, a campaign consultant (and who is the campaign manager for the Vote Reject R-71 Committee, Exhibit P), described his knowledge of the 21-day provision in an October 9, 2009 newspaper article.

- In sum, it appears from what I have reviewed that at least in September 2009 --- and well before the 21-day time period in RCW 42.17.105(8) --- Focus Action, and the Family Policy Institute located at the same street address and with the same contact as Family PAC through Mr. Backholm, and Family PAC's attorneys in this matter, were aware or made themselves aware of RCW 42.17.105(8) and the October 12 deadline, and had the funds available to give on or perhaps even before October 12. Contributions regarding R-71 were made before that date. It also appears that in September 2009 the Family Policy Institute was providing information on its website regarding its opposition to Referendum 71.

**Other Litigation with Plaintiff's Counsel, Challenging RCW 42.17**

69.     I understand that Family PAC is represented in this matter by the Bopp, Coleson & Bostrom law firm. I understand the Court is being made aware that this same law firm is representing clients challenging the constitutionality of RCW 42.17 in other cases.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct and of my own knowledge.

Signed this_____ day of June 2010 at Olympia, Washington.


_____
DOUG ELLIS